John Heenan
john@lawmontana.com
**HEENAN & COOK**
1631 Zimmerman Trail
Billings, Montana 59102
Tel: (406) 839-9091

Lesley E. Weaver*
Anne K. Davis*
Joshua D. Samra*
**BLEICHMAR FONTI & AULD LLP**
1330 Broadway, Suite 630
Oakland, California 94612
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com
adavis@bfalaw.com
jsamra@bfalaw.com

Gregory S. Mullens*
**BLEICHMAR FONTI & AULD LLP**
75 Virginia Road, 2nd Floor
White Plains, New York 10603
Tel.: (415) 445-4006
gmullens@bfalaw.com

*Counsel for Plaintiffs Christina Fordham, Allen Gaters, and Angela Haughton and the Proposed Class*

*\* Pro Hac Vice application forthcoming*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BUTTE DIVISION

| | |
|---|---|
| CHRISTINA FORDHAM, ALLEN GATERS, AND ANGELA HAUGHTON, individually, and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SNOWFLAKE, INC., AT&T, INC., and AT&T MOBILITY LLC,<br><br>Defendants. | Case No. <u>CV-24-92-BU-BMM</u><br><br>**CLASS ACTION**<br><br>**COMPLAINT JURY TRIAL**<br><br>**DEMANDED** |

Plaintiffs Christina Fordham, Allen Gaters, and Angela Haughton, individually and on behalf of all others similarly situated, bring this class action against Snowflake, Inc. ("Snowflake"), AT&T, Inc. and AT&T Mobility LLC (collectively, "AT&T") (together, "Defendants"), and allege, upon personal knowledge as to their own actions, and upon information and belief as to their counsels' investigation and as to all other matters, as follows:

## I.    <u>INTRODUCTION</u>

1.    Plaintiffs bring this proposed class action against Defendants for their failure to safeguard the sensitive information of AT&T customers from a foreseeable cyberattack. Plaintiffs are customers of AT&T whose personally identifiable

information ("PII") was compromised as a result of the breach of AT&T's records stored with and entrusted to Snowflake.

2.     Snowflake is a large cloud-based data warehouse platform that provides businesses with "a single platform to access all data, including data that's unstructured, in open formats, and from third-parties."[1] Snowflake's over 9,000 clients include Defendant AT&T, Adobe, Kraft Heinz, Mastercard, Micron, Capital One, Doordash, HP, Nielsen, Novartis, Okta, PepsiCo, Siemens, Instacart, JetBlue, NBC Universal, US Foods, Western Union, Yamaha, and many others.

3.     Snowflake promotes itself as a leader in the data security industry that "was built to deliver end-to-end data security for all users."[2] It purportedly "follows world-class, standards-based practices for the controls and processes that secure it and is based on a multilayered security architecture to protect customer data and access to that data."[3] Snowflake states that "[a]ll aspects of [its] architecture, implementation, and operation are designed to protect customer data in transit and at rest against both current and evolving security threats."[4]

---

[1] https://www.snowflake.com/en/why-snowflake/ (last visited August 28, 2024).
[2] *Intro to Data Security*, SNOWFLAKE,
https://www.snowflake.com/trending/intro-to-data-security (last visited August 28, 2024).
[3] *Id.*
[4] *Id.*

4.      Notwithstanding its proclaimed first-in-class data security standards, on May 23, 2024, Snowflake became aware that an unauthorized third party had gained access to Snowflake's platform and accessed numerous of its clients' accounts. The third-party threat actor, tracked as UNC5537, claimed to have accessed employee and customer data for 165 of Snowflake's clients, including Defendant AT&T, Advanced Auto Parts, LendingTree's subsidiary QuoteWizard, Ticketmaster, and Santander Bank.

5.      Subsequently, AT&T announced a massive data breach of its records stored on Snowflake's platform. In a Form 8-K filed with the Securities and Exchange Commission ("SEC") on July 12, 2024, AT&T stated that data of "nearly all" of its over 110 million wireless customers, and the customers of mobile virtual network operators ("MVNO") that use AT&T's wireless networks, had been illegally downloaded from AT&T's workspace on a third party cloud platform, which AT&T later confirmed was operated by Snowflake (the "Data Breach"). According to AT&T, the breach occurred between April 14 and April 25, 2024. And the exposed data includes customers' phone numbers, records of calls and text messages, and other call and text log information from between May 1, 2022, and October 31, 2022, as well as on January 2, 2023.

6.      Defendants' failure to implement standard security measures was a significant factor leading to the Data Breach. Snowflake did not at automatically

require its clients to use multifactor authentication ("MFA"), for instance, and AT&T did not implement MFA to access its Snowflake account.

7.     Plaintiffs bring this class action against the Defendants for their failure to properly secure and safeguard the sensitive and personally identifiable information of Plaintiffs and other members of the proposed class ("Class Members") whose data was stored and maintained by Snowflake and AT&T. As a direct and proximate result of Defendants' failure to implement and follow standard security measures, the value of Plaintiffs' and Class Members' personal information diminished. Plaintiffs and Class Members further face an increased risk of identity theft and fraud due to the Data Breach, and must also devote substantial time, money and energy to protect themselves, to the extent possible from these crimes.

## II.     PARTIES

8.     **Plaintiff Fordham** is a natural person, resident, and citizen of California. Plaintiff Fordham has been a customer of AT&T for cellular services for ten years. Plaintiff Fordham called and texted with her AT&T-covered cellphone during the period of May 2022 to October 2022, and likely on January 2, 2023, as well. Upon information and belief, Plaintiff Fordham's information was stored and maintained by the Defendants. As a result of the Defendants' failure to safeguard Plaintiff's personal information, Plaintiff's information was among the data accessed by an unauthorized third party in the Data Breach. In mid-July 2024, Plaintiff

Fordham was notified by AT&T that her PII was compromised in the Data Breach.

9.     As a result of Defendants' conduct, Plaintiff Fordham suffered significant harm, including diminution in the value of Plaintiff's personal information, an increased risk of identity theft and fraud, lost time spent investigating the Breach and monitoring her accounts.

10.    **Plaintiff Gaters** is a natural person, resident, and citizen of California. Plaintiff Gaters has been a customer of AT&T for cellular services since November 2020. Plaintiff Gaters has also used AT&T internet services for over one and a half years. Plaintiff Gaters called and texted with his AT&T-covered cellphone during the period of May 2022 to October 2022, and likely on January 2, 2023 as well. Upon information and belief, Plaintiff Gaters' information was stored and maintained by the Defendants. As a result of the Defendants' failure to safeguard Plaintiff's personal information, Plaintiff's information was among the data accessed by an unauthorized third party in the Data Breach. On July 15, 2024, Plaintiff Gaters was notified by AT&T that his PII was compromised in the Data Breach.

11.    As a result of Defendants' conduct, Plaintiff Gaters suffered significant harm, including diminution in the value of Plaintiff's personal information, an increased risk of identity theft and fraud, and lost time spent investigating the Breach and monitoring his accounts.

12.    **Plaintiff Haughton** is a natural person, resident, and citizen of New York. Plaintiff Haughton has been a customer of AT&T for cellular services since around 2019. Plaintiff Haughton called and texted with her AT&T-covered cellphone during the period of May 2022 to October 2022, and on January 2, 2023 as well. Upon information and belief, Plaintiff Haughton's information was stored and maintained by the Defendants. As a result of the Defendants' failure to safeguard Plaintiff Haughton's personal information, Plaintiff's information was among the data accessed by an unauthorized third party in the Data Breach.

13.    As a result of Defendants' conduct, Plaintiff Haughton suffered significant harm, including diminution in the value of Plaintiff's PII, an increased risk of identity theft and fraud, lost time spent investigating the Data Breach and monitoring her accounts, and payment for crediting monitoring services.

14.    **Defendant Snowflake, Inc.** is a Delaware corporation with its headquarters and principal place of business located at 106 East Babcock Street, Suite 3A, Bozeman, Montana 59715. Snowflake is a publicly traded corporation listed on the New York Stock Exchange with revenues totaling approximately $829 million for the three months ended on April 30, 2024.[5] Snowflake's Data Cloud platform is used globally, with 9,822 institutions trusting Snowflake to manage and

---

[5] https://www.bamsec.com/filing/164014724000135?cik=1640147 (last visited August 28, 2024).

store customers' data.[6] The "substantial majority" of such revenue comes from fees charged to Snowflake's customers "based on the compute, storage, and data transfer resources consumed on [its] platform."[7]

15.    **Defendant AT&T, Inc.** is a Delaware corporation with its principal place of business located at 208 S. Akard St., Dallas, Texas 75202. AT&T is the world's third-largest telecommunications company by revenue and the second-largest wireless carrier in the United States.[8] As of 2023, AT&T was ranked 13th on the Fortune 500 rankings of the largest United States corporations, with revenues of $122.4 billion.[9]

16.    **Defendant AT&T Mobility LLC** is a Delaware corporation with its principal place of business located at 5565 Glenridge Connector, Atlanta, Georgia 30349. It is a wholly owned subsidiary of AT&T, Inc. AT&T Mobility is the second largest wireless carrier in the United States, with 114.5 million subscribers as of March 31, 2024.[10]

---

[6] *Id.*

[7] *Id.*

[8] https://investors.att.com/~/media/Files/A/ATT-IR-V2/financial-reports/quarterly-earnings/2024/1Q24/T_1Q24_Trending_Schedule.pdf (last visited August 28, 2024).

[9] https://www.marketwatch.com/investing/stock/t/financials (last visited August 28, 2024).

[10] https://investors.att.com/~/media/Files/A/ATT-IR-V2/financial-reports/quarterly-earnings/2024/1Q24/T_1Q_2024_8_K_%20Earnings_801.pdf (last visited August 28, 2024).

### III.  **JURISDICTION AND VENUE**

17.    This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d). There are at least 100 members in the proposed class, the aggregated claims of the individual class members exceed the sum or value of $5,000,000, exclusive of interests and costs, and this is a class action in which one or more members of the proposed class, including Plaintiff, are citizens of a state different from Defendants. The Court has supplemental jurisdiction over the alleged state law claims under 28 U.S.C. § 1367 because they form part of the same case or controversy.

18.    This Court has personal jurisdiction over Snowflake because Snowflake's headquarters and principal place of business is located in Bozeman, Montana.

19.    This court has personal jurisdiction over AT&T because it conducts significant business in the state of Montana, stored the PII at issue in Snowflake's systems in Montana, and because a substantial portion of the acts and omissions giving rise to Plaintiffs' claims occurred in this district.

20.    Venue properly lies in this judicial district because it is the district in which Defendant Snowflake, Inc. has the most significant contacts, and a substantial part of the conduct giving rise to the claims, including those against AT&T, occurred in and originated from this judicial district.

9

## IV.    FACTUAL ALLEGATIONS

### A.    Defendants Represented That They Would Keep Customers' PII Safe and Secure

21.    Snowflake is a cloud-based platform that provides "digital warehouse" storage and analytics services to over 9,000 clients, which are generally businesses and companies like AT&T. Snowflake states on its website that "everything is easier in the AI data cloud."[11] It promises that by eliminating data silos and simplifying architecture through the use of Snowflake, the user "can get more value from your data." Snowflake encourages companies to take advantage of the "near-infinite scale" of its cloud storage: "Bring more workloads, users and use cases directly to your data."

22.    In addition to the advantages of the "infinite storage" available in cloud-based data storage, Snowflake also highlights the cost-saving benefits of its services. Its fully managed cloud service can "automate costly and complex operations to reduce overheard [sic] and improve efficiency." Among the key elements of its platform described in its most recent Form 10-K, filed on March 26, 2024, Snowflake touted its "optimized price-performance": "Our platform uses advanced optimizations to efficiently access only the data required to deliver the desired results. It delivers speed without the need for tuning or the expense of manually

---

[11] https://www.snowflake.com/en/ (last visited August 28, 2024).

organizing data prior to use. Organizations can adjust their consumption to precisely match their needs, always optimizing for price-performance."

23.    Snowflake points to AT&T for a case-study of the cost-saving benefits of the cloud:

> AT&T Provides Faster Insights While Lowering Estimated Annual Costs by 84%. This premier enterprise gives more teams near-instant access to powerful insights for better decision-making and customer experiences — all while cutting costs and improving performance by switching to Snowflake.
> KEY RESULTS: 84% Savings on estimated annual costs, thanks to results caching."[12]

Among the highlights of the AT&T case-study, Snowflake identified the following:

- Proactive troubleshooting for a better customer experience: Democratized access to data helps AT&T find and fix issues— before they impact customers.

- Greater collaboration, fewer silos: Snowflake's Secure Data Sharing eliminates internal silos and allows AT&T's business partners to maintain control of their data while sharing—without having to move or copy data.

---

[12] https://www.snowflake.com/en/customers/all-customers/case-study/att/ (last visited August 28, 2024).

24.    Snowflake markets itself as a leader in the data security industry, claiming to "set the standard for data security." It claims it "was built to deliver end-to-end data security for all users," "world-class, standards-based practices for the controls and processes . . . to protect customer data and access to that data," and "comprehensive security framework."[13] It further claims that "[a]ll aspects of Snowflake's architecture, implementation, and operation are designed to protect customer data in transit and at rest against both current and evolving security threats."[14]

25.    Snowflake further acknowledges the risk of data breaches and utilizes this threat to promote its products. Snowflake's website states, for instance:[15]

- "In today's connected world where cybercriminals have greater opportunity than ever before, data security is crucial for every business."

- "Data breaches cause customers to lose trust in a business, and they can significantly damage a company's reputation if news of the breach gets out to the media."

---

[13] *Intro to Data Security*, SNOWFLAKE, https://www.snowflake.com/trending/intro-to-data-security (last visited August 28, 2024).
[14] *Id.*
[15] *Id.*

- "[D]ata security should be a priority for every business in every industry, not just highly regulated industries such as healthcare and finance."

26.    Snowflake has experienced great success and tremendous growth for the company as a result of its offering of cloud-based data warehousing services. It posted a revolving graphic identifying some of the more than 7,200 "leading companies [that] lead with Snowflake," including Zoom, Sub-Zero, Orangetheory Fitness, Adobe, Cisco, Comcast, and the University of Notre Dame, in addition to AT&T and other companies previously mentioned. In its latest Form 10-K, Snowflake noted that in the month of January alone, "we processed an average of approximately 4.2 billion daily queries across all our customer accounts, up from an average of approximately 2.6 billion daily queries during the corresponding month of the prior fiscal year." And as of January 31, 2024, Snowflake had 9,437 customers, up from 7,744 customers as of January 31, 2023. Snowflake's revenue similarly increased: "For the fiscal years ended January 31, 2024, 2023, and 2022, our revenue was $2.8 billion, $2.1 billion, and $1.2 billion, respectively, representing year-over-year growth of 36% and 69%, respectively."

27.    Partly as a result of its representations, Snowflake's clients, such as AT&T, entrust it with large amounts of customer data.

28.    AT&T "operate[s] one of the largest networks in the world, connecting more than 100 million U.S. families, friends and neighbors, plus nearly 2.5 million businesses."[16] As of December 31, 2023, AT&T's wireless services generate 52% of its reported revenues.[17]

29.    AT&T publicly markets its top-of-the line security, claiming to provide "continuous and near-real-time security monitoring of the AT&T network for investigation, action and response to network security events."[18] AT&T further states:[19]

> We maintain a network and information security program that is **reasonably designed to protect our information**, and that of our customers, from unauthorized risks to its confidentiality, integrity or availability. **Our program encompasses the CSO and its policies, platforms, procedures and processes for assessing, identifying and managing risks from cybersecurity threats, including third-party risk from vendors and suppliers**; the program is generally designed to identify and respond to security incidents and threats in a timely manner to minimize the loss or compromise of information assets and to facilitate incident resolution. Our policies and

---

[16] https://sustainability.att.com/priority-topics/network-data-security (last visited August 28, 2024).

[17] https://www.sec.gov/ix?doc=/Archives/edgar/data/732717/000073271724000009/t-20231231.htm (last visited August 28, 2024).

[18] https://sustainability.att.com/priority-topics/network-data-security (last visited August 28, 2024).

[19] *Id.*

**standards are based in part on leading industry standards** such as ISO/IEC 27001.

30.     Despite promising and promoting itself as delivering "world class" safety and offering "leading industry standards," Defendants failed to adequately control access to Plaintiffs' and Class Members' personal information.

**B.     AT&T's Privacy Notice Provides Further Assurances that Customers' PII will be Kept Safe**

31.     In order to access AT&T's services, Plaintiffs and Class Members must provide AT&T with private and personally identifiable information, including name, date of birth, Social Security Number, phone number, and address. When Plaintiffs signed up for an account with AT&T, AT&T provided their Privacy Notice, which "applies to AT&T products and services including internet, wireless, voice and AT&T apps."[20]

32.     AT&T's Privacy Notice states that "To better run our business, we collect information about you, your equipment and how you use our products and services." It identifies the information it collects as including:[21]

> **Account information**. You give us information about yourself, such as contact and billing information. We also

---

[20] https://about.att.com/privacy/privacy-notice.html (last visited August 28, 2024).
[21] AT&T explains: "We use Customer Proprietary Network Information (CPNI) to offer new types of products and services we think you'd like from AT&T and our affiliates. CPNI is information about your telecommunications and VoIP (internet phone) services from us, including what plans you subscribe to, how you use these services and details such as who you have called."
https://www.att.com/consent/cpni/ (last visited August 28, 2024).

keep service-related history and details, including Customer Proprietary Network Information (https://www.att.com/consent/cpni/).

**Equipment information**. We collect information about equipment on our network like the type of device you use, device ID, and phone number.

**Network performance**. We monitor and test the health and performance of our network. This includes your use of Products and Services to show how our network and your device are working.

**Location information**. Location data is automatically generated when devices, products and services interact with cell towers and Wi-Fi routers. Location can also be generated by Bluetooth services, network devices and other tech, including GPS satellites.

**Web browsing and app information**. We automatically collect a variety of information which may include time spent on websites or apps, website and IP addresses and advertising IDs. It also can include links and ads seen, videos watched, search terms entered and items placed in online AT&T shopping carts. We may use pixels, cookies and similar tools to collect this information. We don't decrypt information from secure websites or apps – such as passwords or banking information.

**Biometric information**. Fingerprints, voice prints and face scans are examples of biological characteristics that may be used to identify individuals. Learn more in our Biometric Information Privacy Notice (/privacy/privacy-notice/biometrics.html).

**Third-party information**. We get information from outside sources like credit reports, marketing mailing lists and commercially available demographic and geographic data. Social media posts also may be collected, if you reach out to us directly or mention AT&T.

33.     AT&T's Privacy Notice further provides customers with details regarding AT&T's promises to protect this customer data, as well as the ways in which AT&T uses this customer data. These uses include using customer data to provide and improve services, as well as for AT&T's own benefit. AT&T uses its customer data to: "Combine it with the information from testing and running our network to determine which products and services better meet the needs of our customers;" to "Improve your experience and safety. This includes verifying your identity, detecting and preventing fraud, protecting your financial accounts, authorizing transactions and assisting your interactions with customer care;" to "Use it to help understand which additional products and services may interest you and others;" and to "Design and deliver advertising, marketing and promotional campaigns to you and others."[22]

34.     In addition to using customer data in these ways, AT&T also shares customer data with third parties, including its own affiliates and "non-AT&T companies." AT&T requires its affiliates to "follow this Privacy Notice regarding your info, not just their own policy." In addition, AT&T requires the third parties it shares customer information with "to use it only for the intended purpose and to protect it consistent with this notice."

---

[22] https://about.att.com/privacy/privacy-notice.html (last visited August 28, 2024).

35.     The provision of the Privacy Notice pertaining to data retention and security describes AT&T's efforts to protect the data its customers have provided:[23]

> We keep your information as long as we need it for business, tax or legal purposes. We set our retention periods based on things like what type of personal information it is, how long it's needed to operate the business or provide our products and services, and whether it's subject to contractual or legal obligations. These obligations might be ongoing litigation, mandatory data retention laws or government orders to preserve data for an investigation. After that, we destroy it by making it unreadable or indecipherable.
>
> We work hard to safeguard your information using technology controls and organizational controls. We protect our computer storage and network equipment. We require employees to authenticate themselves to access sensitive data. We limit access to personal information to the people who need access for their jobs. And we require callers and online users to authenticate themselves before we provide account information.
>
> No security measures are perfect. We can't guarantee that your information will never be disclosed in a manner inconsistent with this notice. If a breach occurs, we'll notify you as required by law.

36.     In collecting Plaintiffs' and Class Members' data pursuant to the terms of its own Privacy Notice, AT&T undertook the responsibility to protect and safeguard that data.

---

[23] *Id.*

**C.**    **Plaintiffs' and Class Members' PII was Exposed in the Data Breach**

37.    In April 2024, the cybersecurity firm, Mandiant, received information regarding a suspected theft of data from Snowflake's platform. Mandiant informed Snowflake and was engaged by Snowflake to investigate the suspected breach. Pursuant to that investigation, Mandiant determined that Snowflake's platform had been compromised by a threat actor "using credentials previously stolen via infostealer malware" and that the threat actor "used these stolen credentials to access the customer's Snowflake instance and ultimately exfiltrate valuable data."[24]

38.    Mandiant further concluded that "the credentials were easily accessed by bad actors in part because impacted accounts were not configured with multi-factor authentication enabled, meaning successful authentication only required a valid username and password." While Snowflake made MFA available to its customers, including AT&T, it was not a required to access customers' data and administrators could not set MFA policies systemwide.

39.    Snowflake's security failure was compounded by AT&T's additional failure to encrypt or institute additional multi-factor authentication protections for its data stored by Snowflake.

---

[24] https://cloud.google.com/blog/topics/threat-intelligence/unc5537-snowflake-data-theft-extortion (last visited August 28, 2024).

40.    On May 22, 2024, Mandiant began contacting Snowflake's clients to inform them of the breach. As of June 10, 2024, Mandiant and Snowflake had notified approximately 165 potentially exposed organizations. The organizations whose data were compromised as a result of this Breach include Defendant AT&T, Advanced Auto Parts, LendingTree's subsidiary QuoteWizard, Ticketmaster operator Live Nation, and Santander Bank.

41.    On July 12, 2024, AT&T announced that data of "nearly all" its 110 million cellular customers was illegally downloaded from its workspace on a third-party cloud platform, which AT&T confirmed was operated by Snowflake.[25] The stolen data includes the phone numbers of both cellular and landline customers and records of calls and text messages between May 1, 2022 and October 31, 2022, as well as on January 2, 2023. The stolen data also includes records identifying every phone number that an AT&T phone number interacted with, including the phone numbers of non-AT&T customers, the number of times AT&T customers interacted with those other phone numbers, the total count of AT&T customers' calls and texts, and aggregated duration of calls.

---

[25] https://www.nytimes.com/2024/07/12/business/att-data-breach.html (last visited August 28, 2024).

42.    AT&T further admitted in its Form 8-K that "[f]or a subset of records, one or more cell site identification number(s) are also included."[26] While AT&T stated that the compromised data did not include customer names, it admitted that "there are often ways, using publicly available online tools, to find the name associated with a specific telephone number."[27]

43.    AT&T reported to have learned of the threat actor on April 19, 2024 but stated that the "U.S. Department of Justice determined that, under Item 1.05(c) of Form 8-K, a delay in providing public disclosure was warranted."[28] AT&T further reported that it was "working with law enforcement in its efforts to arrest those involved in the incident" and that "it understands that at least one person has been apprehended."[29]

44.    The data exposed as a result of the breach is uniquely sensitive information and includes PII and other sensitive information. Allowing cybercriminals to access this sensitive data leaves AT&T's customers vulnerable to fraud and identity theft. For example, a CNN report on the incident identified several ways that bad actors can use the stolen AT&T customer data:

---

[26] https://www.sec.gov/ix?doc=/Archives/edgar/data/732717/000073271724000009/t-20231231.htm (last visited August 28, 2024).

[27] *Id.*

[28] *Id.*

[29] *Id.*

[A] hacker could see that a customer is in constant contact with a big bank's line and could send a phishing attempt posing as the bank. The hacker could text the customer saying, "This is Bank of America. We have some suspicious activity on your account. Click this link to review the charges, or call this number," said John Dwyer, director of security research at Binary Defense, a cybersecurity solutions firm. Or the hacker could pose as someone the customer has a personal relationship with, like a friend or family member. The age of artificial intelligence makes this even more pressing, according to Collin Walke, cybersecurity and data privacy partner at Hall Estill. "Once they know who you've been communicating with, it allows deep fakes and those sorts of hacks to occur much easier," Walke said. Some customers' cell tower ID numbers were also exposed, which could help some bad actors track down geolocations, Walke said. That could also make these hacking attempts more believable.

45.    Other reports went into further detail about how the stolen data can be used by bad actors to further victimize AT&T's customers and the customers of the MVNOs that use AT&T's networks. For example, a *New York Times* article explains:[30]

"Some information resulting from the breach may be used to piece together events and who may be calling who, which can impact people's private lives as personal calls and connections could be exposed," said Abhishek Karnik, McAfee's head of threat research.

It would take extensive effort to verify the people behind all the phone numbers in the data. But careful analysis might reveal someone's political affiliations or sexual

[30] https://www.nytimes.com/wirecutter/reviews/how-to-protect-yourself-att-breach/ (last visited August 28, 2024).

orientation based on the businesses and organizations they interact with. It could also show if someone has contacted abortion services or gender-affirming health care. That information could then be used for harassment, or possibly legal action depending on where the person lives.

46.    In addition, United States Senators Richard Blumenthal and Josh Hawley sent a letter to AT&T on July 16, 2024, demanding information about the data Breach and noting the risks of the exposed data. They state: "While the records do not directly include names and addresses, as AT&T's Securities and Exchange Commission filing notes, the stolen data includes location information and it is easy to find the name associated with a phone number. Taken together, the stolen information can easily provide cybercriminals, spies, and stalkers a logbook of the communications and activities of AT&T customers over several months, including where those customers live and traveled — a stunning and dangerous breach of its customers' privacy and intrusion into their personal lives."[31]

47.    On or around July 12, 2024, AT&T began notifying Plaintiffs and Class Members of the Data Breach via electronic mail ("Email Notice"). The Email Notice explained as follows:[32]

> We're reaching out to let you know that some of your data was accessed without authorization.
>
> . . .

---

[31] https://www.blumenthal.senate.gov/imo/media/doc/2024-07-16_snowflake_breach_att.pdf (last visited August 28, 2024).

[32] https://www.gunsandrovers.com/forum/guns-and-rovers-main/campfire/224179-at-t-data-breach (last visited August 28, 2024).

**What happened?**
We found out AT&T call and text records were accessed by cyber-criminals who have claimed responsibility for unlawful access to other companies in the past. At least one individual has since been arrested.

**What information was involved?**
The investigation indicates the data included the phone numbers of some of your call interactions with wireless phone numbers from May 1, 2022 to October 31, 2022. It also included counts of those calls and total call durations for specific days or months.

**The compromised data does not include the content of calls nor personal information, such as Social Security numbers, birth dates, or financial information. It also does not include some typical information you see in your usage details, such as the time stamp of calls.**

**What is AT&T doing?**
Protecting customer data is a top priority. We have confirmed the affected system has been secured. We hold ourselves to high privacy standards and are always looking for ways to improve our security practices.

**What can you do?**
It is always advisable to be careful when taking calls from numbers that you do not recognize and stay alert to any fraud or theft attempts.

For more information and details about the information that was accessed, go to **att.com/dataincident**.

For additional tips on privacy and data protection, go to **CyberAware**.

We apologize for any inconvenience and remain committed to protecting the information in our care.

D.    **The Data Breach was a Foreseeable Risk of Which Defendants were on Notice and Could Have Prevented**

48.    Defendants had a responsibility to protect the personal information entrusted to them by Plaintiffs and Class Members by implementing sufficient security measures, including but not limited to MFA.

49.    Defendants further had a duty to safeguard customers' PII pursuant to industry standards and duties imposed by statutes, including Section 5 of the Federal Trade Commission Act (the "FTC Act"), which requires company's maintain reasonable and appropriate data security measures. The FTC has issued guidance specifically to the entities which use cloud-based services, and reminded them that securing the information on the cloud-based services is their corporate responsibility.[33]

50.    Defendants are sophisticated technology companies—Snowflake is one of the largest cloud storage providers in the world and AT&T is one of the largest telecommunications providers in the country. They are well aware of their duty to safeguard information and that the data they collect and store are valuable targets for data thieves. Indeed, AT&T and Snowflake regularly identify cyberattacks as a "risk factor" that could materially affect their businesses in their Form 10-K.[34]

---

[33] https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited August 28, 2024).

[34] https://www.sec.gov/ix?doc=/Archives/edgar/data/732717/000073271724000009/

51.     AT&T also knew or should have known it was subject to attack from prior incidents. For example, in August 2021, AT&T was alerted of the presence of AT&T customer data for sale on the dark web. Despite this report, AT&T denied that the information had come from their dataset and denied that it had suffered a data breach.[35]

52.     Further, AT&T already experienced a massive breach of AT&T customer data earlier this year. In March 2024, AT&T confirmed that the data of 73 million current and former AT&T customers was exposed in a data breach conducted by cybercriminals. The data stolen in that event included names, phone numbers, postal addresses, and Social Security numbers, as well as AT&T account numbers and AT&T encrypted passcodes that could be used to access customer accounts. AT&T confirmed that "the Snowflake breach is unrelated" to the previous data breach.[36]

53.     Yet, despite knowing that its customers' data was valuable and was at risk of cyberattack, Defendants continued to store massive amounts of its customers'

---

t-20231231.htm (last visited August 28, 2024);
https://www.sec.gov/ix?doc=/Archives/edgar/data/732717/000073271724000009/
t-20231231.htm (last visited August 28, 2024).

[35] https://www.bleepingcomputer.com/news/security/atandt-denies-data-breach-after-hacker-auctions-70-million-user-database/ (last visited August 28, 2024).

[36] https://arstechnica.com/tech-policy/2024/07/nearly-all-att-subscribers-call-records-stolen-in-snowflake-cloud-hack/ (last visited August 28, 2024).

data in an insecure manner. In doing so, Defendants made itself a "massive target for hackers."[37]

54.    Had Snowflake implemented a policy requiring MFA to access customers' records or even just allowed companies who use Snowflake's cloud servers to enforce MFA features systemwide the Data Breach may have been prevented. Notably, since the Data Breach, Snowflake has established a new security policy to allow administrators to require MFA for all users or specific roles—further showing that this is a reasonable safety measure that Snowflake should have implemented pre-breach.[38]

55.    Likewise, AT&T failed to encrypt or otherwise institute additional multi-factor authentication protections for the personal information of Plaintiffs and Class Members stored by Snowflake.

56.    Defendants were aware of the importance of MFA as it is an industry standard that should be required "wherever possible."[39] In addition, AT&T's own product brief for its AT&T MFA business offering touted the importance of using multi-factor authenticators "to protect your network and devices from breaches

---

[37] https://www.latimes.com/business/story/2024-07-17/column-why-hugely-profitable-corporations-dont-spend-enough-to-keep-hackers-from-stealing-customer-info (last visited August 28, 2024).

[38] https://www.cybersecuritydive.com/news/snowflake-mfa-policy-change/720851/ (last visited August 28, 2024).

[39] https://www.cisa.gov/secure-our-world/require-multifactor-authentication (last visited August 28, 2024).

related to identity."[40] AT&T further stated about MFA that "Cybercriminals use automated code breaking brute force attacks to infiltrate a network, steal passwords, and steal or ransom your data or your customers' data. It's more difficult and costly to clean up after an attack than to prevent it in the first place. To stay ahead on security, it's a smart move to invest in a virtually unphishable credential authentication system."[41] Despite understanding the importance of MFA, Defendants inexplicably failed to implement it.

57.    By failing to implement reasonable security measures to safeguard Plaintiffs' and Class Members' PII, Defendants breached their duties to and disregarded the rights of Plaintiffs and the Class Members.

**E.    Injuries to Plaintiffs and Class Members**

58.    As a result of Defendants' inadequate security and breach of their duties and obligations, the personally identifiable information of Plaintiffs and Class Members was compromised through disclosure to an unauthorized criminal third party. Plaintiffs and Class Members have suffered injuries as a direct and proximate result of Defendants' conduct. Plaintiffs and Class Members now face an increased risk of identity theft and will consequentially have to spend, and will continue to spend, significant time and money to protect themselves due to the Data Breach.

---

[40] https://cdn-cybersecurity.att.com/docs/product-briefs/att-multi-factor-authenticator.pdf (last visited August 28, 2024).

[41] *Id.*

59.    Plaintiffs and other customers paid AT&T for its services and AT&T, in turn, paid for Snowflake for its services. At least a partial payment for Defendants' services was attributed to protecting Plaintiffs' and Class Members' information in their possession, including the information released to criminals here.

60.    The data breach "has laid the groundwork for significant economic disadvantages, particularly affecting minority communities. The stolen data, although it did not include personal communication content, still included details like the location of cellular towers close to the subscriber. This information could be exploited to approximate the location of customers during calls or texts, heightening the risk of economic profiling and targeted scams. . . . Furthermore, the data breach disclosed call and text records of mobile providers reselling AT&T's service, which could be leveraged by malicious entities to orchestrate more convincing fraud schemes."[42]

61.    Further, AT&T has admitted that "there are often ways to find a name associated with a phone number using publicly available online tools."[43]

62.    AT&T recognizes that Plaintiffs and Class Members face an increased risk of identity theft, online fraud and online threats, because of the Data Breach.

---

[42] https://www.forbes.com/sites/korihale/2024/07/23/the-unseen-consequences-of-atts-data-breach-on-minority-communities/ (last visited August 28, 2024).

[43] https://www.att.com/support/article/my-account/000102979?source=EPcc000000000000U (last visited August 28, 2024).

AT&T offered guidance Plaintiffs and Class Members in its online notice and responses to "Frequently Asked Questions" relating to the Data Breach:[44]



63.     Plaintiffs and Class Members must now spend their own time, money, and energy to monitor their accounts to ensure personal information obtained in this Data Breach is not used to further harm them. This includes the need to review all financial activity, monitor credit status, update previously secure passwords and logins to an increasing variety of accounts, scrutinize communications, and seek out and purchase credit monitoring services and identity theft protection.

---

[44] https://www.att.com/support/article/my-account/, *supra.*

64.     Once personal information is exposed, there is virtually no way to ensure that the exposed information has been recovered or contained against future misuse. It was recently reported that AT&T paid one of the hackers $370,000 to delete stolen data and provide a video as "proof" that the data was deleted; however, "some AT&T customers and those who communicated with them may still be at risk."[45]

65.     Plaintiffs have also overpaid AT&T (and thus, in turn Snowflake) for its services, a portion of which was dedicated to protecting Plaintiffs' personal information and activities while using AT&T's services.

66.     In addition, there is the prospect that the stolen data can be aggregated and combined with the data from other data breaches, including the AT&T data breach announced earlier this year.

## V.     CLASS ACTION ALLEGATIONS

67.     Plaintiff brings this action on his own behalf, and on behalf of the following Classes:

**The Nationwide Class**

All individuals residing in the United States whose personally identifiable information was compromised as a result of the Data Breach.

**The California Subclass**

---

[45] https://www.wired.com/story/atandt-paid-hacker-300000-to-delete-stolen-call-records/ (last visited August 28, 2024).

All individuals residing in California whose personally identifiable information was compromised as a result of the Data Breach

**The New York Subclass**

All individuals residing in New York whose personally identifiable information was compromised as a result of the Data Breach

68.    The Nationwide Class and Subclasses are referred to herein as "Class," unless otherwise stated.

69.    Excluded from the proposed Class are: Defendants, any entity in which Defendants have a controlling interest, is a parent or subsidiary, or which is controlled by Defendants, as well as the officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns of Defendants; and judicial officers to whom this case is assigned and their immediate family members.

70.    Plaintiffs reserve the right to re-define the Class definition after conducting discovery.

71.    **Numerosity (Fed. R. Civ. P. 23(a)(1)).** The Class Members are so numerous that joinder of all members is impracticable. Based on information and belief, the Class includes millions of people whose PII was compromised as a result of the Data Breach. The parties will be able to identify the exact size of the Class through discovery and Defendants' records.

72.    **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2); 23(b)(3)).** Common questions of law and fact exist for each of the claims and

predominate over questions affecting only individual members of the Class. Questions common to the Class include, but are not limited to the following:

a.  Whether Defendants had a legal duty to implement and maintain reasonable security procedures and practices for the protection of Plaintiffs' and Class Members' PII;

b.  Whether Defendants breached their legal duty to implement and maintain reasonable security procedures and practices for the protection of Plaintiffs' and Class Members' PII;

c.  Whether Defendants acted willfully, recklessly, or negligently in connection with the maintenance of reasonable security procedures and practices to protect Plaintiffs' and Class Members PII;

d.  Whether Defendants' conduct, practices, actions, and omissions, resulted in or was the proximate cause of the Data Breach, resulting in the loss of Plaintiffs' and Class Members PII;

e.  Whether Defendants had a legal duty to provide timely and accurate notice of the data breach to Plaintiffs and Class Members;

f.  Whether Defendants breached their duty to provide timely and accurate notice of the Data Breach to Plaintiff and Class Members;

g.  Whether and when Defendants knew or should have known that their systems were vulnerable to attack;

33

h.  Whether Defendants adequately addressed and fixed the vulnerabilities that enabled the Data Breach;

i.  Whether Defendants received a benefit without proper restitution making it unjust for Defendants to retain the benefit without commensurate compensation;

j.  Whether Defendants violated state Unfair Competition Laws;

k.  Whether Plaintiffs and Class Members suffered legally cognizable damages as a result of Defendants' conduct, including increased risk of identity theft and loss of value of their PII; and

l.  Whether Plaintiffs and Class Members are entitled to relief, including compensatory damaged, punitive damages, and/or statutory or civil penalties, and equitable relief.

73.  **Typicality (Fed. R. Civ. P. 23(a)(3)).** Pursuant to Rule 23(a)(3), Plaintiffs' claims are typical of the claims of the Class Members. Plaintiffs' claims are typical of the claims of the members of the Class because all Class Members' reimbursement payments were delayed following the Data Breach and all Class Members were harmed as a result.

74.  **Adequacy of Representation (Fed. R. Civ. P. 23(a)(4)).** Pursuant to Rule 23(a)(4), Plaintiffs and their counsel will fairly and adequately protect the interests of the Class. Plaintiffs have no interest antagonistic to, or in conflict with,

the interests of the Class Members. Plaintiffs have retained counsel experienced in prosecuting class actions and data breach cases.

75. **Superiority (Fed. R. Civ. P. 23(b)(3)).** Pursuant to Rule 23(b)(3), a class action is superior to individual adjudications of this controversy. Litigation is not economically feasible for individual Class Members because the amount of monetary relief available to individual plaintiffs is insufficient in the absence of the class action procedure. Separate litigation could yield inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. A class action presents fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

76. **Risk of Inconsistent or Dispositive Adjudications and the Appropriateness of Final Injunctive or Declaratory Relief (Fed. R. Civ. P. 23(b)(1) and (2)).** In the alternative, this action may properly be maintained as a class action, because:

    a. the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual Class Members which would establish incompatible standards of conduct for Defendant; or

b.  the prosecution of separate actions by individual Class Members would create a risk of adjudications with respect to individual Class Members which would, as a practical matter, be dispositive of the interests of other Class Members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; or

c.  Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole.

77.  **Issue Certification (Fed. R. Civ. P. 23(c)(4)).** In the alternative, the common questions of fact and law, set forth in Paragraph 81, are appropriate for issue certification on behalf of the proposed Class.

## VI.  CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
### *(On Behalf of Plaintiffs and the Class Against All Defendants)*

78.  Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

79.  Defendants owed a duty to Plaintiffs and all other Class Members to exercise reasonable care in safeguarding and protecting their PII in Defendants' possession, custody, or control.

80.     Defendants knew, or should have known, the risks of collecting and storing Plaintiffs' and all other Class Members' PII and the importance of maintaining secure systems. Defendants knew, or should have known, of the vast uptick in data breaches in recent years. Defendants had a duty to protect the PII of Plaintiffs and Class Members.

81.     Given the nature of Defendants' businesses, the sensitivity and value of the PII they maintain, and the resources at their disposal, Defendants should have identified the vulnerabilities to their systems and prevented the Data Breach from occurring, which Defendants had a duty to prevent.

82.     Defendants breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class Members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII entrusted to it—including Plaintiffs' and Class Members' PII.

83.     It was reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class Members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized

release, disclosure, and dissemination of Plaintiffs' and Class Members' PII to unauthorized individuals.

84.    But for Defendants' negligent conduct or breach of the above-described duties owed to Plaintiffs and the Class Members, their PII would not have been compromised.

85.    As a result of Defendants' above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiffs and all other Class Members have suffered, and will continue to suffer, economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII; (iii) breach of the confidentiality of their PII; (iv) deprivation of the value of their PII, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face; and (vii) actual or attempted fraud.

## COUNT II
## NEGLIGENCE *PER SE*
### *(On Behalf of Plaintiffs and the Class Against All Defendants)*

86.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

87.    Defendants' duties arise from Section 5 of the FTC Act, 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by a business, such as Defendants, of failing to employ reasonable measures to protect and secure PII.

88.    Defendants violated Security Rules and Section 5 of the FTC Act by failing to use reasonable measures to protect Plaintiffs' and all other Class Members' PII and not complying with applicable industry standards. Defendants' conduct was particularly unreasonable given the nature and amount of PII it obtains and stores, and the foreseeable consequences of a data breach involving PII including, specifically, the substantial damages that would result to Plaintiffs and the other Class Members.

89.    Defendants' violations of Security Rules and Section 5 of the FTCA constitute negligence *per se*.

90.    Plaintiffs and Class Members are within the class of persons that Security Rules and Section 5 of the FTCA were intended to protect.

91.    The harm occurring because of the Data Breach is the type of harm Security Rules and Section 5 of the FTCA were intended to guard against.

92.    It was reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class Members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor,

and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiffs' and Class Members' PII to unauthorized individuals.

93.    The injury and harm that Plaintiffs and the other Class Members suffered was the direct and proximate result of Defendants' violations of Security Rules and Section 5 of the FTCA. Plaintiffs and Class Members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII; (iii) breach of the confidentiality of their PII; (iv) deprivation of the value of their PII, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach; and (vi) actual or attempted fraud.

## COUNT III
## BREACH OF FIDUCIARY DUTY
### *(On Behalf of Plaintiffs and the Class Against Defendant AT&T)*

94.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

40

95.     Plaintiffs and Class Members either directly or indirectly gave Defendant AT&T their PII in confidence, believing that Defendant would protect that information. Plaintiffs and Class Members would not have provided Defendant AT&T with this information had they known it would not be adequately protected. Defendant's acceptance and storage of Plaintiffs' and Class Members' PII created a fiduciary relationship between Defendant and Plaintiffs and Class Members. Considering this relationship, Defendant AT&T must act primarily for the benefit of Plaintiffs and Class Members, which includes safeguarding and protecting Plaintiffs' and Class Members' PII.

96.     Defendant AT&T has a fiduciary duty to act for the benefit of Plaintiffs and Class Members upon matters within the scope of their relationship. Defendant AT&T breached that duty by failing to properly protect the integrity of the system containing Plaintiffs' and Class Members' PII, failing to safeguard the PII of Plaintiffs and Class Members they collected.

97.     As a direct and proximate result of Defendant's breaches of its fiduciary duties, Plaintiffs and Class Members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with effort attempting to mitigate the

actual and future consequences of the Data Breach; (v) the continued risk to their PII which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII compromised as a result of the Data Breach; and (vii) actual or attempted fraud.

**COUNT IV**
**UNJUST ENRICHMENT**
***(On Behalf of Plaintiffs and the Class Against All Defendants)***

98.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

99.    Plaintiffs and Class Members conferred a monetary benefit upon Defendants in the form of monies paid for services—namely, they provided and entrusted AT&T with their valuable PII. AT&T, in turn, entrusted Plaintiffs' and the Class Members' information to Snowflake, and on behalf of Plaintiffs and the Class paid a fee to Snowflake for its data storage services. Therefore, AT&T and Snowflake have been receiving payments (at least in part) intended to protect Plaintiffs' and Class Members' information. AT&T funds its data security measures (including to payments to Snowflake) from payments made by and on behalf of Plaintiffs and the Class Members.

100.    AT&T paid Snowflake (on behalf of Plaintiffs and the Class) for its data storage services, a portion of which was intended to provide them with a

reasonable level of data security from both AT&T and Snowflake in order to protect Plaintiffs' and the Class Members' PII.

101.   In exchange for their payment, Plaintiffs and Class Members were entitled to reasonable measures to protect their PII.

102.   Defendants appreciated, accepted, and retained the benefit bestowed upon them under inequitable and unjust circumstances arising from their conduct toward Plaintiffs and Class members as described herein—namely, (a) Plaintiffs and Class members conferred a benefit on Defendants, and Defendants accepted or retained that benefit; and (b) Defendants used Plaintiffs' and Class Members' PII for business purposes.

103.   Defendants failed to secure Plaintiffs' and Class Members' PII and, therefore, did not provide full compensation for the benefit provided on behalf of Plaintiffs and Class Members.

104.   Defendants acquired the PII through inequitable means in that it failed to disclose its inadequate security practices previously alleged.

105.   Plaintiffs and Class Members have no adequate remedy at law for the injuries in that a judgment for monetary damages will not end the invasion of privacy for Plaintiffs and the Class.

106.   Under the circumstances, it would be unjust and unfair for Defendants to be permitted to retain any of the benefits conferred by or on behalf of Plaintiffs and the Class.

107.   Under the principles of equity and good conscience, Defendants should not be permitted to retain the PII belonging to Plaintiffs and Class Members because Defendants failed to implement the data management and security measures that industry standards mandate.

108.   Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received on behalf of and for the benefit of Plaintiffs and the Class.

<u>COUNT V</u>
**BREACH OF THIRD-PARTY BENEFICIARY CONTRACT**
*(On Behalf of Plaintiffs and the Class Against Defendant Snowflake)*

109.   Plaintiffs re-allege and incorporate by reference all preceding factual allegations as though fully set forth herein.

110.   Defendant Snowflake entered into contracts with its various corporate clients, including AT&T to provide data storage services and maintain secure data cloud systems. These contracts were made expressly for the benefit of Plaintiffs and Class Members, who were customers and/or employees of AT&T. In order to effectuate offered services and upon information and belief as to the exact terms of

the contract, Defendant Snowflake agreed to collect, store, and protect Plaintiffs' and Class Members' PII.

111.   Thus, the benefit of collection, protection, and storage of the PII was the direct, intended, and primary objective of the contracting parties.

112.   Defendant Snowflake breached its contract with AT&T when it failed to use reasonable data security measures that could have prevented the Data Breach and resulting compromise of Plaintiffs' and Class Members' PII.

113.   Defendant Snowflake knew that if it were to breach its contracts, the harm would befall its clients' customers and employees for whom the benefit was intended to confer. As such, Defendant Snowflake's failure to uphold the terms of its contract and allow for the Data Breach has foreseeably harmed Plaintiffs and the Class.

114.   Accordingly, Plaintiffs and Class Members are entitled to damages in an amount to be determined at trial, along with their costs including attorneys' fees incurred.

<u>**COUNT VI**</u>
**INVASION OF PRIVACY**
***(On Behalf of Plaintiffs and the Class Against All Defendants)***

115.   Plaintiffs re-allege and incorporate by reference all preceding factual allegations as though fully set forth herein.

116.   Plaintiffs and Class Members have a legally protected privacy interest in their PII that Defendants required them to provide and/or allow them to store.

117.   Plaintiffs and Class Members reasonably expected their PII would be protected and secured from unauthorized parties, would not be disclosed to any unauthorized parties or disclosed for any improper purpose.

118.   Defendants unlawfully invaded the privacy rights of Plaintiffs and Class Members by (a) failing to adequately secure their PII from disclosure to unauthorized parties for improper purposes; (b) leaving their PII exposed to unauthorized parties in a manner that is highly offensive to a reasonable person; and (c) leaving their PII exposed to unauthorized parties without the informed and clear consent of Plaintiffs and Class Members. This invasion into the privacy interest of Plaintiffs and Class Members is serious and substantial.

119.   In failing to adequately secure Plaintiffs' and Class Members' PII, Defendants acted in reckless disregard of their privacy rights. Defendants knew or should have known that their substandard data security measures are highly offensive to a reasonable person in the same position as Plaintiffs and Class Members.

120.   Defendants violated Plaintiffs' and Class Members' right to privacy under the common law as well as under state and federal law.

121.   As a direct and proximate result of Defendants' unlawful invasions of privacy, Plaintiffs' and Class Members' PII has been viewed or is at imminent risk of being viewed, and their reasonable expectations of privacy have been intruded upon and frustrated. Plaintiffs and the proposed Class have suffered injury as a result of Defendants' unlawful invasions of privacy and are entitled to appropriate relief.

## COUNT VII
## BREACH OF CONTRACT
### *(On Behalf of Plaintiffs and the Class Against Defendant AT&T)*

122.   Plaintiffs re-allege and incorporate by reference all preceding factual allegations as though fully set forth herein.

123.   As a condition of purchasing products and services from AT&T, Plaintiffs agreed to the terms in AT&T's Privacy Notice.[46]

124.   The Privacy Notice formed a contract between AT&T and Plaintiffs and Class Members.

125.   Under this contract AT&T promised that it "work[s] hard to safeguard your information using technology controls and organizational controls. We protect our computer storage and network equipment. We require employees to authenticate themselves to access sensitive data. We limit access to personal information to the

---

[46] https://about.att.com/privacy/privacy-notice.html (last visited August 28, 2024).

people who need access for their jobs. And we require callers and online users to authenticate themselves before we provide account information."[47]

126.    AT&T also promised that while it shares customers' PII with certain third parties it requires those parties to protect that information consistent with its Privacy Notice.[48]

127.    Additionally, AT&T's July 12, 2024 notice of "Unlawful access of customer data" posted on its website promises: "We hold ourselves to a high standard and commit to delivering the experience that you deserve. We constantly evaluate and enhance our security to address changing cybersecurity threats and work to create a secure environment for you. We invest in our network's security using a broad array of resources including people, capital, and innovative technology advancements."[49]

128.    In return, Plaintiffs and Class members promised, among other things, to allow AT&T to collect and share their PII.[50]

129.    Plaintiffs and Class Members performed their obligations under the Privacy Notice when they provided their PII to AT&T in relation to their purchasing and using AT&T cellular products and services.

---

[47] *Ibid.*
[48] *Ibid.*
[49] https://www.att.com/support/article/my account/000102979?source=EPcc000000000000U (last visited August 28, 2024).
[50] https://about.att.com/privacy/privacy-notice.html (last visited August 28, 2024).

130.   By allowing unauthorized users to gain access to Plaintiffs' and Class Members' PII through the Data Breach, AT&T breached its contractual obligations. As a result, AT&T failed to comply with its own policies, including its Privacy Notice, and applicable laws, regulations and industry standards for data security and protecting the confidentiality of Plaintiffs' and Class Members' PII. AT&T's breach of contract also violated California Business and Professions Code § 22576, which prohibits a commercial website operator from "knowingly and willfully" or "negligently and materially" failing to comply with the provisions of its posted privacy policy.

131.   By failing to fulfill its contractual obligations under its Privacy Policy, AT&T failed to confer on Plaintiffs and Class Members the benefit of the bargain, causing them economic injury.

132.   As a direct and proximate result of the Data Breach, Plaintiffs and Class Members have been harmed and have suffered, and will continue to suffer, damages and injuries.

<u>**COUNT VIII**</u>
**BREACH OF IMPLIED CONTRACT**
*(On Behalf of Plaintiffs and the Class Against Defendant AT&T)*

133.   Plaintiffs re-allege and incorporate by reference all preceding factual allegations as though fully set forth herein.

134.   Defendant AT&T provided Plaintiffs and Class Members with an implied contract to protect and keep their PII private.

135.   Plaintiffs and Class Members would not have provided their PII to Defendant AT&T or its subsidiaries or contractors, but for Defendant AT&T's implied promises to safeguard and protect their information.

136.   Plaintiffs and Class Members performed their obligations under the implied contract when they provided their PII to Defendant AT&T for cellular and other services provided by Defendant AT&T.

137.   Defendant AT&T breached the implied contracts with Plaintiffs and Class Members by failing to protect and keep private their PII.

138.   As a direct and proximate result of Defendant AT&T's breach of its implied contracts, Plaintiffs and Class Members have been harmed and have suffered, and will continue to suffer, damages and injuries.

## COUNT IX
## DECLARATORY RELIEF
### *(On Behalf of Plaintiffs and the Class Against All Defendants)*

139.   Plaintiffs re-allege and incorporate by reference all preceding factual allegations as though fully set forth herein.

140.   An actual controversy has arisen in the wake of the Data Breach regarding Defendants' duties to safeguard and protect Plaintiffs' and Class Members' PII. Defendants' security measures were (and continue to be) woefully

inadequate. Defendants dispute these contentions and contend that their security measures are appropriate.

141.    Plaintiffs and Class Members continue to suffer damages and exposure to other injury and harm, and without a declaratory relief, they will likely continue to suffer further injury, a possibility of a future data breach, and harm.

142.    Therefore, Plaintiffs and Class Members request a judicial determination of their rights and duties, and ask the Court to enter a judgment declaring, *inter alia*, (i) Defendants owed (and continue to owe) a legal duty to safeguard and protect Plaintiffs' and Class Members' confidential and sensitive PII, and timely notify them about the Data Breach, (ii) Defendants breached (and continue to breach) such legal duties by failing to safeguard and protect Plaintiffs' and Class Members' PII, and (iii) Defendants' breach of their legal duties directly and proximately caused the Data Breach, and the resulting damages, injury, or harm suffered by Plaintiffs and Class Members. A declaration from the Court ordering Defendants to stop their illegal practices is required. Plaintiffs and Class Members will otherwise continue to suffer harm as alleged above.

1.    <u>**CLAIMS ON BEHALF OF THE CALIFORNIA SUBCLASS**</u>

<u>**COUNT X**</u>
**VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW
("UCL"), CAL. BUS. & PROF. CODE §§ 1700, *et seq.*
*(On Behalf of California Plaintiffs and the California Subclass Against All
Defendants)***

143.    Plaintiffs re-allege and incorporate by reference all preceding factual

allegations as though fully set forth herein.

144.    Plaintiffs Christina Fordham and Allen Gaters (the "California

Plaintiffs") bring this Claim on behalf of themselves and members of the California

Subclass.

145.    The UCL prohibits any "unlawful," "fraudulent" or "unfair" business

act or practice and any false or misleading advertising, as those terms are defined by

the UCL and relevant case law. By virtue of the above-described wrongful actions,

inaction, omissions, and want of ordinary care that directly and proximately caused

the Data Breach, Defendants engaged in unlawful, unfair and fraudulent practices

within the meaning, and in violation of, the UCL.

146.    In the course of conducting its business, Defendants committed

"unlawful" business practices by, *inter alia*, knowingly failing to design, adopt,

implement, control, direct, oversee, manage, monitor and audit appropriate data

security processes, controls, policies, procedures, protocols, and software and

hardware systems to safeguard and protect Plaintiffs' and Class members' PII, and

by violating the statutory and common law alleged herein. Plaintiffs and Class Members reserve the right to allege other violations of law by Defendants constituting other unlawful business acts or practices. Defendants' above-described wrongful actions, inaction, omissions, and want of ordinary care are ongoing and continue to this date.

147.    Defendants' above-described wrongful actions, inaction, omissions, want of ordinary care, misrepresentations, practices, and non-disclosures also constitute "unfair" business acts and practices in violation of the UCL in that Defendants' wrongful conduct is substantially injurious to consumers, offends legislatively-declared public policy, and is immoral, unethical, oppressive, and unscrupulous. Defendants' practices are also contrary to legislatively declared and public policies that seek to protect PII and ensure that entities who solicit or are entrusted with personal data utilize appropriate security measures, as reflected by laws such as the Article I, Section 1 of the California Constitution (California's constitutional right to privacy) and the Federal Trade Commission Act ("FTC Act") (15 U.S.C. § 45). The gravity of Defendants' wrongful conduct outweighs any alleged benefits attributable to such conduct. There were reasonably available alternatives to further Defendants' legitimate business interests other than engaging in the above-described wrongful conduct.

148.   The UCL also prohibits any "fraudulent business act or practice." Defendants' above-described claims, nondisclosures and misleading statements were false, misleading and likely to deceive the consuming public in violation of the UCL.

149.   As a direct and proximate result of Defendants' above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach and its violations of the UCL, Plaintiffs and Class Members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*, (i) an imminent, immediate and the continuing increased risk of identity theft and identity fraud—risks justifying expenditures for protective and remedial services for which they are entitled to compensation, (ii) invasion of privacy, (iii) breach of the confidentiality of their PII, (iv) statutory damages, (v) deprivation of the value of their PII, for which there is a well-established national and international market, and/or (vi) the financial and temporal cost of monitoring their credit, monitoring financial accounts, and mitigating damages.

150.   Unless restrained and enjoined, Defendants will continue to engage in the above-described wrongful conduct and more data breaches will occur. Plaintiffs, therefore, on behalf of themselves individually, Class Members, and the general public, also seek restitution and an injunction prohibiting Defendants from

continuing such wrongful conduct, and requiring Defendants to modify their corporate culture and design, adopt, implement, control, direct, oversee, manage, monitor and audit appropriate data security processes, controls, policies, procedures protocols, and software and hardware systems to safeguard and protect the PII entrusted to them, as well as all other relief the Court deems appropriate, consistent with Bus. & Prof. Code § 17203.

## COUNT XI
### VIOLATION OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT, CALIFORNIA CIVIL CODE §§ 1750, *et seq.*
*(On Behalf of California Plaintiffs and the California Subclass Against All Defendants)*

151.    Plaintiffs re-allege and incorporate by reference all preceding factual allegations as though fully set forth herein.

152.    Plaintiffs Christina Fordham and Allen Gaters (the "California Plaintiffs") bring this Claim on behalf of themselves and members of the California Subclass.

153.    The California Consumer Legal Remedies Act ("CLRA") prohibits certain "unfair methods of competition and unfair or deceptive acts or practices" in connection with a sale of goods.

154.    Defendants' unlawful conduct described herein was intended to increase sales to the consuming public and violated and continue to violate Section

1770(a)(5), (a)(7), and (a)(9) of the CLRA by representing that the products and services have characteristics and benefits which they do not have.

155.  Defendants fraudulently deceived California Plaintiffs and the California Subclass by representing that their products and services have certain characteristics, benefits, and qualities which they do not have, namely data protection and security. In doing so, Defendants intentionally misrepresented and concealed material facts from California Plaintiffs and the California Subclass, specifically by advertising secure technology when Defendants in fact failed to institute adequate security measures and neglected system vulnerabilities that led to a data breach. Said misrepresentations and concealment were done with the intention of deceiving California Plaintiffs and the California Subclass and depriving them of their legal rights and money.

156.  Defendants' claims about the products and services led and continues to lead consumers like California Plaintiffs to reasonably believe that Defendants have implemented adequate data security measures when Defendants in fact neglected system vulnerabilities that led to a data breach and enabled hackers to access consumers' PII.

157.  Defendants knew or should have known that adequate security measures were not in place and that consumers' PII was vulnerable to a data breach.

158. California Plaintiffs and the California Subclass have suffered injury in fact as a result of and in reliance upon Defendants' false representations.

159. California Plaintiffs and the California Subclass would not have purchased the products or used the services, or would have paid significantly less for the products and services, had they known that their PII was vulnerable to a data breach.

160. Defendants' actions as described herein were done with conscious disregard of California Plaintiffs' rights, and Defendants were wanton and malicious in their concealment of the same.

161. California Plaintiffs and the California Subclass have suffered injury in fact and have lost money as a result of Defendants' unfair, unlawful, and fraudulent conduct. Specifically, California Plaintiffs paid for products and services advertised as secure, and consequentially entrusted Defendants with their PII, when Defendants in fact failed to institute adequate security measures and neglected vulnerabilities that led to a data breach. California Plaintiffs and the California Subclass would not have purchased the products and services or would not have provided Defendants with their PII, had they known that their PII was vulnerable to a data breach.

162. Defendants should be compelled to implement adequate security practices to protect consumers' PII. Additionally, California Plaintiffs and the

members of the California Subclass lost money as a result of Defendants' unlawful

practices.

163.    At this time, California Plaintiffs seek injunctive relief under the CLRA

pursuant to Cal. Civ. Code § 1782(d); but they anticipate the need to amend the

complaint and seek restitution.

<u>COUNT XII</u>
<u>CALIFORNIA CONSUMER PRIVACY ACT,</u>
**CAL. CIV. CODE § 1798,** ***et seq.***
***(On Behalf of California Plaintiffs and the California Subclass Against All***
***Defendants)***

164.    Plaintiffs re-allege and incorporate by reference all preceding factual

allegations as though fully set forth herein.

165.    Plaintiffs Christina Fordham and Allen Gaters (the "California

Plaintiffs") bring this Claim on behalf of themselves and members of the California

Subclass.

166.    The California Consumer Privacy Act ("CCPA") protects California

consumers' constitutional right to privacy and provides consumers with a private

right of action against businesses that breach their duty to take reasonable steps to

protect consumers' personal information from unauthorized access, theft, or

disclosure. Cal. Civ. Code § 1798.150(a)(1).

167.    Defendants Snowflake and AT&T are each a "Business" as defined by

the CCPA: a "legal entity that is organized or operated for the profit or financial

benefit of its shareholders or other owners, that collects consumers' personal information," and that both does business in the State of California and has "annual gross revenues in excess of twenty-five million dollars ($25,000,000)." Cal. Civ. Code § 1798.140(d).

168.   California Plaintiffs and the California Subclass are consumers as defined by the CCPA: "'Consumer' means a natural person who is a California resident." Cal. Civ. Code § 1798.140(i).

169.   Defendants stored California Plaintiffs' personal information, as defined by the CCPA: "'Personal information' means information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household." Cal. Civ. Code § 1798.140(v)(1). Personal information can include but is not limited to: "Identifiers such as a real name, alias, postal address, unique personal identifier, online identifier, Internet Protocol address, email address, account name, social security number, driver's license number, passport number, or other similar identifiers." Cal. Civ. Code § 1798.140(v)(1)(A).

170.   Defendants collected, stored and/or transmitted California Plaintiffs' personal information in a nonencrypted and nonredacted form. As a business under the CCPA, Defendants owed a duty to Plaintiffs "to implement and maintain reasonable security procedures and practices appropriate to the nature of the

information to protect the personal information." Cal. Civ. Code § 1798.150(a)(1). California Plaintiffs' personal information was accessed by third parties without authorization, demonstrating that Defendants failed in their duty to implement and maintain reasonable security procedures and practices to protect California Plaintiffs' personal information.

171.   As a direct and proximate result of Defendants' failure to implement and maintain reasonable security procedures and practices appropriate to the nature of California Plaintiffs' personal information, California Plaintiffs suffered unauthorized access and exfiltration, theft, or disclosure of their personal information.

172.   As a direct and proximate result of the unauthorized disclosure of their personal information, California Plaintiffs were injured and are at high risk of suffering further injury, including future data breaches, identity theft and fraud, and negative impact to their credit.

173.   California Plaintiffs seek injunctive relief, actual damages, statutory damages, and any other relief the Court deems proper pursuant to the CCPA, such as costs and attorneys' fees.

## COUNT XIII
## CALIFORNIA CUSTOMER RECORDS ACT,
### CAL. CIV. CODE § 1798.80, *et seq.*
*(On Behalf of California Plaintiffs and the California Subclass Against All Defendants)*

174.   Plaintiffs re-allege and incorporate by reference all preceding factual allegations as though fully set forth herein.

175.   Plaintiffs Christina Fordham and Allen Gaters (the "California Plaintiffs") bring this Claim on behalf of themselves and members of the California Subclass.

176.   The California Customer Records Act ("CRA") was enacted "to ensure that personal information about California residents is protected." Cal. Civ. Code §1798.81.5(a)(1). The CRA requires that any business "that owns, licenses, or maintains personal information about a California resident shall implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the personal information from unauthorized access, destruction, use, modification, or disclosure." Cal. Civ. Code §1798.81.5(b).

177.   Defendants own, maintain, and license personal information about California Plaintiffs and the California subclass, as defined by the CRA.

178.   Defendants failed to implement and maintain reasonable security procedures and practices to protect California Plaintiffs' personal information from

unauthorized access, destruction, use, modification, or disclosure, thereby violating the CRA.

179.   As a direct and proximate result of Defendants' violation of the CRA, California Plaintiffs' personal information was accessed without authorization in the Data Breach.

180.   Further, Defendants did not timely notify California Plaintiffs of the Data Breach, thereby violating the notice provisions of the CRA, which require that "disclosure shall be made in the most expedient time possible and without unreasonable delay." Cal. Civ. Code §1798.82(a).

181.   As a direct and proximate result of Defendants' violations of the CRA, California Plaintiffs' damages and injury and are at high risk of suffering further damage and injury, including time and expenses related to monitoring their financial accounts and credit for fraudulent activity and increased risk of identity theft and fraud.

**2.    CLAIMS ON BEHALF OF THE NEW YORK SUBCLASS**

**COUNT XIV**
VIOLATION OF N.Y. GEN. BUS. LAW § 349
*(On Behalf of New York Plaintiffs and the New York Subclass Against*
*Defendant AT&T)*

182.    Plaintiffs re-allege and incorporate by reference all preceding factual allegations as though fully set forth herein.

183.    Plaintiff Angela Haughton (the "New York Plaintiff") brings this Claim on behalf of herself and members of the New York Subclass.

184.    New York General Business Law Section 349 ("GBL § 349") declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state."

185.    Defendant AT&T engaged in deceptive acts or practices in the conduct of its business, trade, and commerce or furnishing of services, in violation of N.Y. Gen. Bus. Law § 349, including:

    a.  Failing to implement and maintain reasonable security and privacy measures to protect New York Plaintiff's and the New York Subclass Members' PII, which was a direct and proximate cause of the Data Breach;

    b.  Failing to identify and remediate foreseeable security and privacy risks and sufficiently improve security and privacy measures despite

knowing the risk of cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of New York Plaintiff's and the New York Subclass Members' PII, including the duties imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach;

d. Misrepresenting that it would protect New York Plaintiff's and the New York Subclass Members' PII, including by implementing and maintaining reasonable security measures;

e. Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of New York Plaintiff's and the New York Subclass Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45;

f. Omitting, suppressing, and concealing the material fact that it did not properly secure New York Plaintiff's and the New York Subclass Members' PII; and

g. Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of New York Plaintiff's and the New York

Subclass Members' PII, including duties imposed by the FTC Act,
15 U.S.C. § 45.

186.   AT&T's representations and omissions were material because they
were likely to deceive reasonable customers about the adequacy of AT&T's data
security and its ability to protect New York Plaintiff's and the New York Subclass
Members' PII.

187.   AT&T's deceptive and unlawful acts and practices complained of
herein affected the public interest and consumers at large, including the many New
Yorker affected by the Data Breach.

188.   The above deceptive and unlawful practices and acts by AT&T caused
substantial injury to New York Plaintiff and the New York Subclass that they could
not have reasonably avoided. As a direct and proximate result of AT&T's unlawful
and deceptive acts and practices, New York Plaintiff and the New York Subclass
Members have suffered, and will continue to suffer, damages and other actual and
ascertainable losses of money or property, and monetary and non-monetary damages
and harm, including but not limited to: (i) a substantially increased risk of identity
theft, necessitating expenditures for protective and remedial services for which they
are entitled to compensation; (ii) improper disclosure of their PII; (iii) breach of the
confidentiality of their PII; (iv) deprivation of the value of their PII, for which there
is a well-established national and international market; (v) lost time and money spent

mitigating and remediating the effects of the Data Breach; and (vi) actual or attempted fraud.

189.    New York Plaintiff and the New York Subclass Members seek all monetary and non-monetary relief allowed by law, including actual and statutory damages, treble damages, injunctive relief, and attorneys' fees and costs.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and Class Members, request judgment against Defendant and that the Court grants the following:

A.    For an Order certifying the Class, and appointing Plaintiffs and their Counsel to represent the Class;

B.    For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the PII of Plaintiffs and Class Members;

C.    For injunctive relief requested by Plaintiffs, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members, including but not limited to an order:

i.    prohibiting Defendants from engaging in the wrongful and unlawful acts described herein;

ii.    requiring Defendants to protect, including through encryption,

all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state, or local laws;

iii.  requiring Defendants to delete, destroy, and purge the personal identifying information of Plaintiffs and Class Members unless Defendants can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and Class Members;

iv.  requiring Defendants to provide out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII for Plaintiffs' and Class Members' respective lifetimes;

v.  requiring Defendants to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiffs and Class Members;

vi.  requiring Defendants to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and

ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

vii. requiring Defendants to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii. requiring Defendants to audit, test, and train its security personnel regarding any new or modified procedures;

ix. requiring Defendants to segment data by, among other things, creating firewalls and controls, so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

x. requiring Defendants to conduct regular database scanning and securing checks;

xi. requiring Defendants to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiffs and Class Members;

xii.    requiring Defendants to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiii.    requiring Defendants to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendants' policies, programs, and systems for protecting personal identifying information;

xiv.    requiring Defendants to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendants' information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv.    requiring Defendants to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect herself;

xvi.  requiring Defendants to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and

xvii.  for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendants' compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D.  For an award of damages, including actual, nominal, statutory, consequential, and punitive damages, as allowed by law in an amount to be determined;

E.  For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.  For prejudgment interest on all amounts awarded; and

G.  For such other and further relief as this Court may deem just and proper.

## VIII.  DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all issues so triable.

Dated: August 30, 2024

Respectfully submitted,

*/s/ John Heenan*
John Heenan
john@lawmontana.com
**HEENAN & COOK**
1631 Zimmerman Trail
Billings, Montana 59102
Tel: (406) 839-9091

Lesley E. Weaver*
Anne K. Davis*
Joshua D. Samra*
**BLEICHMAR FONTI & AULD LLP**
1330 Broadway, Suite 630
Oakland, California 94612
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com
adavis@bfalaw.com
jsamra@bfalaw.com

Gregory S. Mullens*
**BLEICHMAR FONTI & AULD LLP**
75 Virginia Road, 2nd Floor
White Plains, New York 10603
Tel.: (415) 445-4006
gmullens@bfalaw.com

***Counsel for Plaintiffs Christina Fordham, Allen Gaters, and Angela Haughton and the Proposed Class***

*\* Pro Hac Vice application forthcoming*